ESTHER PRADO MARTORELL, Plaintiff and Appellee, *v.* FRANCISCO QUIÑONES ET AL., Defendants and Appellants.

No. 10421. Argued January 10, 1952.—Decided May 11, 1955.

---

[6] Jointly with The Escambrón Development Company, Inc., and United States Casualty Co.

*Hugh R. Francis, Vicente M. Ydrach* and *Emilio de Aldrey* for appellants. *Charles R. Hartzell, Rafael O. Fernández, P. Juvenal Rosa* and *José L. Novas* for appellee.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

Esther Prado Martorell filed an action for damages against Francisco Quiñones and the Escambrón Beach Club Hotel Corp., lessees of the buildings and recreational facilities located at San Juan and known as the Escambrón Beach Club; against the insurer United States Casualty Company, and against The Escambrón Development Company, Inc., owner and lessor of said buildings and recreational facilities.

The complaint, in brief, set forth the following facts as basis for the claim: On May 2, 1947, certain repairs were being carried on in one of the buildings of the Escambrón Beach Club, by the defendants Francisco Quiñones and The Escambrón Development Company, Inc., jointly. In order to form a passage and give access to the apartments in an adjoining building, the employees of the defendants placed a loose plank without putting any sign or warning of danger. The place where the plank was put was poorly lighted. About 9:30 p.m. the plaintiff was on her way with Alexander Storik to one of said apartments, occupied by the latter, and as they walked over the plank which served as a passage, the same moved abruptly, causing plaintiff to lose her footing and fall on her right side with her left foot caught between the plank and the debris left there. As a result of

said fall the plaintiff suffered three fractures and the dislocation of her left ankle, making it necessary for her to be confined in bed, and preventing her from working as manager of the Pan American Crafts Inc., for a period of four and a half months, during which she suffered from phlebitis in her left leg. The injuries caused "intense physical pain, mental and moral anguish and suffering" and even at the time the complaint was filed the plaintiff still suffered "frequently serious nervous breakdowns as a result of the aforesaid accident." She incurred expenses for medical treatment and hospitalization in the amount of $2,213.50. She calculated the total damages at $25,000, the amount which she claimed. It was alleged that the accident was caused exclusively by the negligence of the defendants, Francisco Quiñones, Escambrón Beach Club and The Escambrón Development Company, Inc., "in placing the plank used as a passage without taking the necessary precautions to protect the persons who had to walk across to go to the aforesaid apartments; in not putting any sign or warning of danger upon crossing the plank, and in failing to have said place sufficiently lighted, or anything to hold onto in order to avoid falling."

In its answer, The Escambrón Development Company, Inc. admitted its capacity of lessor as well as the fact that at the time alleged in the complaint certain repairs were being made on the floor of the ballroom "Salón de las Naciones," but denied intervention of any kind, denying also the other essential facts alleged.

The other three codefendants, in turn, in answering jointly, admitted that about May 2, 1947, the defendant, Francisco Quiñones, was doing business under the name of Escambrón Beach Club; that the defendant Escambrón Beach Club Hotel Corp. was a corporation organized and existing under the laws of Puerto Rico, whose principal stockholder was the defendant, Francisco Quiñones, and that

the aforesaid corporation took charge of all the property, rights and obligations of said defendant Francisco Quiñones, as well as that the defendant United States Casualty Company, at the time alleged in the complaint, had an insurance contract with said codefendant Quiñones. They also admitted that "on the aforesaid date of May 2, 1947, the Escambrón Beach Club was under repair" but they alleged that "said repairs were done independently by the codefendant, The Escambrón Development Co., on its own account, and without the intervention of the other codefendant, Francisco Quiñones." They denied the allegations of negligence and also—for lack of sufficient information—that the plaintiff suffered damages of any kind.

After a trial on the merits, the lower court rendered judgment "sustaining the complaint and consequently ordering the defendants Francisco Quiñones and/or Escambrón Beach Club Corporation, The Escambrón Development Company and the defendant, United States Casualty Company, jointly and severally (*mancomunada y solidariamente*), to pay to the plaintiff, Esther Prado Martorell, the sum of $19,966 for damages suffered by her, said amount including $3,500 for plaintiff's physical injuries, the sum of $6,000 for mental anguish and nervous breakdown, the sum of $3,000 for permanent partial disability of 30 per cent in her left leg, $4,250 for salary and other compensation which she failed to receive, and $3,216 for expenses which the plaintiff was forced to incur until the date of trial; plus the costs and the sum of $4,000 for attorney's fees." [1]

The Escambrón Development Company, Inc., on the one hand, and Francisco Quiñones, Escambrón Beach Club Hotel Corp. and United States Casualty Company on the other, appealed from said judgment.

---

[1] The liability of the United States Casualty Company as insurer of Francisco Quiñones and/or Escambrón Beach Club Hotel Corp., under the policy is limited to the sum of $10,000.

The Escambrón Development Company, Inc., charges the trial court with the following errors: (1) "in including in its findings of fact finding No. 12, that because of her incapacity to work in the production and design of women's apparel during part of 1947, Esther Prado Martorell failed to receive a bonus for said year and in awarding plaintiff in its judgment any compensation whatsoever which she failed to receive other than the salary which she did not earn during the four and a half months that she was absent from work"; (2) "in concluding in its finding of fact No. 11 that in the opinion of Dr. Montilla, the plaintiff would have to confine herself in an institution in the United States for a period of approximately a year and a half, as well as that it also erred in granting the plaintiff the sum of $6,000 for mental anguish and nervous breakdown which, according to the court, requires additional medical treatment and hospitalization in an institution in the United States"; (3) "in concluding in its finding of fact No. 4 that The Escambrón Development Co., Inc., had under its absolute control and dominion the entire floor of the ballroom 'Salón de las Naciones' "; (4) "in concluding in its finding of fact No. 4 that the contractor in charge of the reconstruction prohibited Francisco Quiñones Aguiar, the lessee, from using the gate which gives access to the street and which is located between the main building and the apartments"; (5) "in concluding in its finding of fact No. 5 that during the reconstruction of the floor of the ballroom 'Salón de las Naciones,' the tenants and guests of the Escambrón Beach Club continued to use, as a rule, the corner of the ballroom as a passage way, without any objection on the part of the officers and employees of The Escambrón Development Company, Inc."; (6) "in concluding in its finding of fact No. 9 that The Escambrón Development Co. did not provide for and/or furnish the tenants and guests of the Escambrón Beach Club any other kind of safe passage to the apartments"; (7) "in concluding that The Escambrón Develop-

ment Co., Inc., was guilty of negligence together with the Escambrón Beach Club and Hotel Corp. and/or Francisco Quiñones and that their negligence was the proximate cause of the accident suffered by the plaintiff, as well as that it also erred in ordering The Escambrón Development Co., Inc., to pay to the plaintiff any sum of money for damages"; and (8) "in awarding plaintiff the sum of $4,000 for attorney's fees inasmuch as said sum is obviously excessive."

The other three appellants allege, on their part, that the court erred (1) "in sustaining the complaint and sentencing the defendants-appellants Francisco Quiñones and/or Escambrón Beach Club Corp. and Francisco Quiñones' insurer, U.S. Casualty Co., together with the other codefendant, The Escambrón Development Co., Inc., thereby determining that the codefendants-appellants appearing herein were also liable for the accident suffered by the plaintiff-appellee"; (2) "in weighing the evidence introduced and in holding that Francisco Quiñones was the one who ordered that a plank be placed from the triangle or corner formed by the door space in the third archway adjoining the kitchen and the door of the ballroom 'Salón de las Naciones' which had access to the floor leading to the apartments"; (3) "in rendering judgment against the Escambrón Beach Club Corp. jointly with Francisco Quiñones"; (4) "in rendering judgment ordering the defendants to pay to plaintiff $3,500 for physical injury and $6,000 for mental anguish and for a nervous breakdown, because it constituted a double indemnity for the same damage and because at the same time the latter was an improper sum in a case of this nature"; (5) "in rendering judgment ordering the defendants to pay an indemnity as compensation for damages amounting to the sum of $12,500, said sum being excessive"; (6) "in weighing the evidence and holding that the plaintiff, because of her incapacity for work during the year 1947, as a result of the accident, received no bonus for said year and in awarding her an amount for such bonus as compensation" and (7) "in order-

ing the defendants to pay the sum of $4,000 for attorney's fees, said sum being altogether excessive because there was no obstinacy on the part of the defendants in the defense of this case."

Inasmuch as several of the assignments of the appellant, The Escambrón Development Company, Inc., coincide with some of the assignments of the other appellants, we shall consider them jointly when such is the case.

■■ The first assignment of the appellant, The Escambrón Development Company, Inc., is similar to the sixth assignment of the other appellants. It is based on the ground that the court unduly included, within the item of "$4,250 for salary and other compensation which she failed to receive", compensation other than the salary which the plaintiff failed to receive. Since the lower court concluded that the plaintiff "failed to earn her salary of $500 monthly during those four and a half months of the year 1947" it is obvious that of the item of $4,250 awarded, $2,000 is for "other compensation which she failed to receive."

The appellants all contend that the awarding of said item does not lie because it was not claimed in the complaint as special damages, and, furthermore, because it constitutes compensation for speculative and remote damages. The appellant, The Escambrón Development Company, Inc., contends, furthermore, that the evidence shows that the plaintiff had no contractual right whatsoever to receive compensation on that account and that the court does not state in its findings of fact or in its judgment, the source of that $2,000 or how it came to the conclusion that the plaintiff was entitled to said amount. The other appellants contend in addition that the court had no basis on which to determine that the plaintiff failed to receive "other compensation" for the aforesaid amount.

Rule 9 (g) of the Rules of Civil Procedure provides that "When items of special damage are claimed, they shall be specifically stated." The same principle existed prior to the

approval of said Rules. *Tuya* v. *White Star Bus Line, Inc.,* 59 P.R.R. 784; *Torres* v. *Ramírez,* 22 P.R.R. 419; Sutherland *on Damages,* 3rd ed., Vol. 4, § 1247, p. 3622 *et seq.;* Joyce *on Damages* (1903), Vol. 1, § 240, pp. 291, 292; McCormick *on Damages* (1935), p. 314; Sedgwick *on Damages,* 9th ed., Vol. 4, § 1261, pp. 2592–2594. Consequently, damages consisting of loss of income must be alleged specifically because they constitute special damages. However, the allegation made in this case, construed for the purpose of doing substantial justice—Rule 8(*f*) of the Rules of Civil Procedure—to the effect that because of the fall described the plaintiff suffered three fractures and the dislocation of her left ankle, "whereby she was confined in bed and was prevented from attending her work as manager of the Pan American Crafts, Inc., for four and a half months" is specific enough to introduce evidence and to receive compensation for loss of earnings during the aforesaid period, *Betances* v. *Transportation Authority,* 73 P.R.R. 215; McCormick, *op. cit.,* 314; Sutherland, *op. cit.,* pp. 3623, 3624; *Joyce, op. cit.,* § 241, p. 292 *et seq.,* inasmuch as under said allegation the defendants were reasonably warned that the plaintiff intended to recover damages for loss of earnings.

 The contention that the compensation granted is one for damages of a speculative character demands an analysis of the nature of the compensation which plaintiff received in addition to her salary. Let us therefore examine the evidence which was introduced in connection with this particular.

According to plaintiff's testimony, at the time of the accident she received a salary of $500 monthly from the Pan American Crafts, Inc. In addition to that salary she received a bonus.[2] Said bonus "depended greatly on my efforts and on the shipments being large," inasmuch as "besides managing the factory, I design." The previous year [1946]

---

[2] The appellee as well as the appellants refer to this additional income indistinctly as *bonus* or *bonification.*

they gave me three thousand two hundred dollars ($3,200) bonus". She received no bonus in 1947. She attributes it to the fact that "I was in no condition to design and be as active as the former year."

On cross-examination—the turn of codefendants Escambrón Beach Club, Francisco Quiñones and U. S. Casualty Co.—she testified that the year of the accident was a good year, "it could have been but with my accident the company had many cancellations and I was unable to design because I design lingerie and blouses and dresses and that is precisely why Mr. Alex had come, for the designing." She stated that besides receiving orders from the United States for things manufactured in the factory here, "besides that, I also design here and offer the merchandise to different stores and buyers come from the United States to contract with me and I take the orders directly from New York without anyone coming; they are orders from buyers who visit me." In the previous year (1946) she took orders for her designs directly from buyers here for over $100,000. In 1947, "I was getting my designs ready in order to contract with the different stores or buyers to offer my line of design." Because of the accident she was unable to continue her work as designer. In 1945 she received a bonus, amounting to more than two thousand dollars; "it was about two thousand odd dollars, nearly three thousand." She has received no bonus in 1948. "In 1949 they pay me whatever corresponds to 1948." Further on she stated that she has received no bonus for the year 1948 "because there has been little work in the factory." When she began working in the factory there was an oral agreement to the effect that for every "extra design I did and for increasing the business" she would receive a bonus. She does not know how the bonus was fixed. It was based on her work.

On cross-examination by counsel for codefendant, The Escambrón Development Company, Inc., she testified that from the time she went to work as manager of the factory

she received yearly bonuses. The bonus agreement was made orally with Mr. Morris Storyk. She explained it as follows: "It is simply that in proportion to the work done in Puerto Rico by orders sent from New York to be shipped by us, I would receive a bonus, an extra bonus according to our work here in Puerto Rico. However, if I got any extra orders for my designs and I dealt directly with the buyers I would also receive an extra bonus, as happened in 1945, in 1946." She receives at present $500 monthly for the management of the factory but "I have been unable to design because I am too nervous and find no peace." The impossibility of designing has prevented her from receiving the bonus as she did formerly.

*Morris Storyk*, President of the corporation which owns the factory managed by the plaintiff at the time of the accident, testified as to the question in issue, that "the plaintiff was receiving a salary of $500 per month from the factory and also one hundred and fifty dollars monthly from the profits of retail sale." Besides her salary "she received an annual bonus, depending on her efforts." She received her last bonus in January 1947, corresponding to 1946, which amounted to more than three thousand two hundred and fifty dollars. She was not paid an additional bonus in 1947 "because she could not create new designs and promote their sale on account of her health."

On cross-examination he testified that in 1947 plaintiff "did not get a bonus as in 1946." The bonus was not a salary, it was not a gift either, "it was paid for something more." In 1947, it was business conditions which decided that plaintiff was not entitled to receive a bonus. "The business was not producing. There was nothing to pay." He attributes the lack of profits in said year to plaintiff's illness. On redirect examination he explained on what basis plaintiff received a bonus: "I assigned a group of twenty-eight department stores to Miss Prado, from New York to California. She created hand-made lingerie for these de-

partment stores. She designed them. She spent many days with the buyers, who came to Puerto Rico. She fixed the prices, manufactured the articles, shipped them to these stores and obtained from all these buyers together, in our office, one hundred and sixty thousand dollars in advance and that is why she received a special bonus of two per cent." That is how the plaintiff got the sum of $3,250 paid in 1946. In 1947 she was assigned no department stores, "it was impossible to assign them to her, I did not assign them. We could not do so because her health did not permit it."

Cross-examined again he testified that the one hundred and sixty thousand dollars collected from orders in 1946 and on the basis of which the plaintiff was paid a bonus of $3,250 "came from twenty-eight department stores of the United States." These contracts lasted "until about the end of the year." The expiration of these contracts had nothing to do with the plaintiff's accident "except that she was unable to design new merchandise and we could not invite these stores to come again and renew their contracts." The granting of a bonus to plaintiff "depends on her extra work." "There is no obligation. Definitively, no."

These statements establish with sufficient clarity that the plaintiff received, besides her salary, an additional income on earned commissions on the orders for articles of her own design shipped by the factory. That loss of income on commissions is recoverable in an action such as the present one, as if predicated upon a fixed salary. *Hirsch* v. *Kendrick*, 43 So. 2d 692 (1950); *Texas Electric Ry.* v. *Worthy*, 250 S. W. 710 (1923); *Gregory* v. *Slaughter*, 99 S. W. 247; McCormick, *op. cit.*, § 87, p. 361; *Cf.* Joyce, *op. cit.*, Vol. 1, § 237, p. 289. The fact that it is more difficult to determine the measure of the damages in cases where plaintiff's income consists of commissions, does not go against said theory. The rule against the recovery of uncertain or speculative damages has been generally directed against uncertainty as to

the existence of the damage itself, the uncertainty as to the measure or extent not being a bar to recovery. See the annotation under the title *Uncertainty as to Damages,* 78 A.L.R. 858. And *Cf.* 46 Harv. L. Rev. 696. Once it has been satisfactorily shown that the damage exists and that its proximate cause was an act or omission of the defendant, it cannot be said that the same is uncertain or speculative. "It does not matter that the determination of the amount thereof may be only approximate, provided that it rests on a reasonable basis and not on mere speculation, or guess." *White Star Bus Line, Inc.* v. *Glens Falls Ind. Co.,* 60 P.R.R. 830, 839; *Palmer* v. *Connecticut Ry. Co.,* 311 U. S. 544, 85 L. Ed. 336. The lower court had before it evidence concerning the amount of the commissions received by plaintiff in former years. That is sufficient ground to determine the reasonable compensation to be awarded for loss of income in the form of commissions for a subsequent year. We do not believe, therefore, that the errors assigned were committed.

██ Assignments Nos. 2 of appellant, The Escambrón Development Company, Inc., and 4 and 5 of the other appellants challenge the amounts awarded for physical injury, mental anguish and nervous breakdown, and for the permanent partial disability of 30 per cent in her left leg.

The Escambrón Development Company, Inc., merely challenges the item of $6,000 granted as compensation for the mental anguish and the nervous breakdown. It contends, in brief, that the reason adduced by the trial court for granting said compensation is an alleged opinion of Dr. Montilla, plaintiff's witness, to the effect that her nervous breakdown required additional treatment and hospitalization in an institution in the United States for a period of approximately a year and a half, and that inasmuch as the aforesaid witness while on the witness stand did not recommend such a thing, said item should be reduced to $2,000. It likewise contends that the granting of any amount for mental anguish is not justified inasmuch as this is not an appropriate case for the granting of such damages.

The other appellants contend that the total sum of $12,500 granted for the three items mentioned "is entirely disproportionate and altogether excessive," and furthermore, that the compensation of $3,500 for plaintiff's physical suffering and that of $6,000 for mental anguish and nervous breakdown is a double indemnity for the same damage. They also argue that the compensation for mental anguish is not proper in cases of this nature.

In its findings of fact the trial court stated the following on this point:

"11. That as a result of the plaintiff's fall she suffered two fractures and a dislocation of her left ankle (fracture-dislocation), which caused her intense physical pain and mental anguish; she had to undergo an operation for the reduction of the fractures, her left leg was placed in a cast and she suffered acute pains, she was confined in the Presbyterian Hospital from May 2 to May 10, 1947, and then confined to bed for some time, undergoing medical treatment by the specialists, Drs. Peter A. Sabatelle, Miguel A. Pardo, Eduardo Montilla and José A. Noya; she was compelled to use crutches and a wheel chair, requiring the aid of nurses in order to move; she was away from her work with Pan American Crafts, Inc., four and a half months; she was compelled to undergo, and at the date of the trial was still undergoing, medical treatment and an intense physiotherapeutic treatment and as a result of the fracture-dislocation she started suffering from arthritis and was still suffering from it at the time of the trial and she was left with a permanent partial disability of 30 per cent in the functions of her left leg, in the ankle, and she likewise suffered and continued suffering at the time of the trial, intense nervous crisis and frequent fainting spells, having one in open court during the trial, all of it as a result of her accident and the treatment which she had to undergo, and in the opinion of Dr. Montilla, under whose care she still was at the time of the trial, she will have to confine herself in an institution in the United States for a period of approximately a year and a half."

By virtue of that finding, it included in its judgment, among others, the following items:

$3,500 for plaintiff's physical suffering;

$6,000 for mental anguish and nervous breakdown; and

$3,000 for the permanent partial disability of 30 per cent in plaintiff's left leg.

This Court has held that in cases like the one at bar, the measure of the damages is the expense of cure, the value of the time lost, reasonable compensation for physical and mental suffering and permanent reduction of earning capacity. *García* v. *Fernández*, 52 P.R.R. 176; *Flores* v. *Sucrs. de Pérez Hnos.*, 29 P.R.R. 977. Once it is determined that plaintiff has experienced the suffering or *mental anguish* as the natural result of the injury inflicted, they are recoverable as an element of the damage. *Ramírez* v. *American Railroad Co. of P. R.*, 17 P.R.R. 440; Joyce, *op cit.*, Vol. I, § 218, p. 267; Sutherland, *op. cit.*, Vol. 4, § 1243, p. 3599, *et seq.;* McCormick, *op cit.*, § 88, p. 325 *et seq.;* Sedgwick, *op. cit.*, Vol. II, § 484, p. 920 *et seq.*

The uncontroverted testimony of Drs. Sabatelle and Montilla point out the degree of disability of the plaintiff as well as her mental and physical suffering as a result of the accident. We do not find the amounts awarded so clearly inadequate or improper as to warrant their disturbance by this Court. *García* v. *Fernández, supra; Rodríguez* v. *American Railroad Co.*, 43 P.R.R. 472; *Aré et al.* v. *Borinquen Sugar Co.*, 17 P.R.R. 886.

True enough, Dr. Montilla, witness for the plaintiff, gave no opinion to the effect that her future treatment had to be in the United States, or that it would take a year and a half, but his testimony clearly and unmistakably established plaintiff's condition as a result of the accident, and the treatment which she had to undergo. His criterion was that the plaintiff should submit to additional treatment *probably outside Puerto Rico.* Although we find no basis in the evidence for the finding of the court concerning the duration of the additional treatment which plaintiff would have to undergo, this in itself does not imply that the compensation granted, not being out of proportion with the condition resulting from

the damage, should be altered. On the other hand, even if —on the theory that a nervous breakdown should be more properly considered and compensated as damage for physical suffering—it was incorrect to include as part of the compensation for mental anguish and suffering, the damages suffered by the plaintiff as a result of the *alteration and breakdown* of her nervous system—in addition to the compensation granted for the *physical suffering*—said error does not warrant the reduction of the total compensation for such items, for there is no double indemnity for physical suffering. Compensation for injury to the nervous system was not included in the amount granted for this item. At most, it would be necessary to readjust the sums awarded, producing no change in the total amount of compensation. The same would merely tend to correct the denomination of the items—not to affect the amount itself—or in other words, to reassign to its proper place the damages which were considered actually proved.

 Assignments Nos. 3, 4, 5, and 6 of The Escambrón Development Company, Inc., and Nos. 1 and 2 of the other appellants challenge in a way the findings made in paragraphs 4, 5 and 9 of the court's findings of fact. Let us see the evidence on which the court based such findings.

Insofar as pertinent, the evidence of the codefendant The Escambrón Development Company, Inc., tended to prove that once the floor of the ballroom "Salón de las Naciones" collapsed, said defendant commenced its reconstruction, and that, although it occupied said ballroom in order to carry on the repairs, the codefendant Quiñones retained the control of a corner thereof placing on it a plank which served as a passage between the dining room and the lane leading to the apartments. Despite the objections of the contractor in charge, the employees of Francisco Quiñones, by order of Estrella Cumpiano de López—who at that time was the assistant of the Manager—placed the aforesaid plank for the use of the employees and guests. While working on the

reconstruction of the floor, the employees of The Escambrón Development Company, Inc., removed the plank because it obstructed the transportation of construction material to the ballroom "Salón de las Naciones". However, once the daily work was over, the employees of the other codefendant, Francisco Quiñones, replaced the plank and continued using it.

Mrs. López gave instructions to the contractor in charge of the work not to allow anyone except the employees of the hotel to go through a side gate—not the main entrance— which was close to the Normandie Hotel. Said instructions were strictly obeyed by the employees of The Escambrón Development Company, Inc. Notwithstanding the fact that there are other entrances to the apartments, the employees of Francisco Quiñones insisted on placing the plank across the floor under construction, to be used by them and the tenants of the apartments, after working hours, when the persons in charge of the work left the place.

The evidence of the other three defendants on that particular was to the effect that the repairs in the ballroom "Salón de las Naciones" were being carried on without their intervention and that, although Francisco Quiñones continued using part of the floor of said ballroom as passage to the apartments, the employees of The Escambrón Development Company, Inc., were the ones who placed the plank to use it as passage way from the dining room to the walk leading to the aforesaid apartments. No person whatsoever in the name of The Escambrón Development Company, Inc., forbade the use of the plank as passage for the guests to the apartments. Notwithstanding the warnings of Mrs. Estrella Cumpiano de López to the employees of The Escambrón Development Company, Inc., to the effect that such passage was dangerous, they kept the plank in the dangerous condition already stated.

Settling the clear conflict in the evidence of the codefendants, the trial court made the following findings of fact:

" . . . . . . . .

"4. That on, before, and after May 2, 1947, the codefendant, The Escambrón Development Company, was making considerable repairs on the whole floor of the ballroom 'Salón de las Naciones' consisting of the total reconstruction of said floor, part of which had collapsed, making it necessary to destroy the rest, and that while performing said works this codefendant had under its absolute control and dominion the entire floor of the ballroom 'Salón de las Naciones' and also that it controlled, in part, through its agents and employees, the access to the ballroom 'Salón de las Naciones' by way of door adjoining the kitchens and a section of the concrete walk from said door to a big gate giving access to the street and located between the main building and the apartments, The Escambrón Development Company employing the gate and the part of the concrete walk up to the door adjoining the kitchen, for the entrance and exit of trucks and wagons carrying construction materials and/or debris deposited in the ballroom 'Salón de las Naciones' during the reconstruction of the floor thereof. The evidence shows that the contractor in charge of the reconstruction works prohibited the codefendant, Quiñones, from using that gate.

"5. That while the reconstruction of the floor of the ballroom 'Salón de las Naciones' was being done, the codefendant Francisco Quiñones and the Escambrón Beach Club continued operating and exploiting 'The Escambrón' keeping it open to the public for pay, and that his tenants or sublessees, and their guests, continued occupying the apartments located on the east side of the main building and which were reached by going through the door of the ballroom 'Salón de las Naciones' adjoining the kitchens, and that said tenants and their guests continued to use said passage ordinarily and uninterruptedly, with the knowledge of and without any objection on the part of the agents and employees of the codefendants, The Escambrón Development Co., who were in charge of and working on the reconstruction of the aforesaid floor of the ballroom 'Salón de las Naciones.'

"6. That while the floor of the ballroom 'Salón de las Naciones' was being repaired, the codefendant, Francisco Quiñones, ordered the construction of three wooden lattices which completely covered the three archways that connected said ballroom 'Salón de las Naciones' with the dining room of the

Escambrón, with the exception of the third archway which is next to the kitchen of said establishment, where an opening was left in the form of a door, to serve as passage for, among others, those persons who had to go to the apartments sublet by said codefendants Francisco Quiñones and which were located on the east side of the main building, it being necessary for the tenants of said apartments and their guests to cut across a corner of the ballroom 'Salón de las Naciones' from the opening in the third archway next to the kitchen to the door of the ballroom 'Salón de las Naciones' which opens on the concrete walk leading to said apartments.

"7. That on, before, and after May 2, 1947, the codefendant, Francisco Quiñones, ordered that a plank approximately twelve (12) inches wide, one and a half (1½) inches thick, and twelve (12) to fourteen (14) feet long be placed in the triangle or corner formed by the opening in the third archway next to the kitchens to the door of the ballroom 'Salón de las Naciones' which opened on the walk leading to the apartments, said plank resting in part on the rubbish and irregular stones of different sizes piled up in said corner and which remained from the reconstruction of the floor of the ballroom 'Salón de las Naciones' and that the tenants of said apartments and their guests walked over said plank usually and ordinarily, with the knowledge of the agents and employees of The Escambrón Development Co., who were in charge of and working on the reconstruction of the floor of the ballroom 'Salón de las Naciones', as previously stated in paragraph 5 of these findings.

"8. That said plank had no ropes or side railings onto which the passersby could hold and that it shook because of the irregular surface of the rubbish on which it rested.

"9. That none of the defendants provided and/or furnished to the tenants and their guests, who occupied said apartments, another safe passageway, nor did they post danger signs or furnish the proper lights for the passage, the only light, which was very poor, coming from the dining hall, and that none of the defendants placed visible signs that the kitchens could be used as a passageway to the apartments, although there is evidence to the effect that some persons occasionally did go through the kitchens to the said apartments.

". . . . . . . ."

The foregoing findings are based on the evidence introduced, and as a result of these findings, as we shall see in considering the next error, neither the lessor nor the lessee can escape its legal liability. We, therefore, dismiss the errors assigned.

 The seventh assignment of The Escambrón Development Company, Inc., and the first of the other appellants, allege that the trial court erred in holding them liable for plaintiff's damages. Let us see, in the light of the findings of fact, of what consisted the negligence of each one of the defendants and by virtue of what juridical relation they are liable to the plaintiff.

The liability of Francisco Quiñones—and with him that of the Escambrón Beach Club Hotel Corporation, and that of the United States Casualty Co., up to the limit of the insurance—stems from the negligent action of Francisco Quiñones in furnishing his tenants and their guests with an inadequate and dangerous means of reaching the apartments which, as part of the operation of his business, he sublet. Quiñones was bound, by virtue of his juridical relation with his tenants—irrespective of the lessor's obligation to him to do the reconstruction work—to furnish them with a safe and adequate means of reaching their rooms. In giving an unsafe and dangerous means, he was guilty —in the discharge of his obligation to them—of negligence which is established by § 1802 of our Civil Code, (1930 ed.), as a legal source for the recovery of damages.

The liability of the codefendant, The Escambrón Development Company, Inc., arises from the negligent conduct that its action entailed in permitting and tolerating the lessee, under the dangerous condition in the ballroom "Salón de las Naciones"—without furnishing its lessee with another adequate way to the apartments so that he could continue operating his business—to put at the place where the repairs were being made, and which were under its control, the plank which served as a bridge for the tenants to reach their rooms.

See *A Passive Situation as a Proximate Cause*, 92 Cent. L. J. 390 *et seq.* Its obligation to said tenants does not arise merely out of the landlord and tenant relation and the subsequent obligation to Quiñones imposed on it by § 1444 of the Civil Code, 1930 ed., [3] *Treasurer* v. *Abate*, 173 So. 196 (La. App., 1937); *Herbert* v. *Herrlitz*, 146 So. 65 (La. App. 1933); 16 Tulane L. Rev. 448. Neither does it flow from the provisions of § 1807 of said Code, [4] because the damages herein did not originate from lack of necessary repairs of a building which is partially in a ruin but rather while it was under repairs. Its obligation arises, under § 1802, from its duty—once the passage through the ballroom "Salón de las Naciones" which it occupied became dangerous—to furnish a safe way for Quiñones' tenants to reach their rooms, its passiveness and tolerance in view of the dangerous condition offered by the unsafe means to which Quiñones resorted in order to continue operating the business to which the lessee devoted the property, being the cause, coactive with Quiñones', of the damages ensuing. *Cf. Pérez* v. *Gandía*, 32 P.R.R. 517, 519, and *Torres* v. *Fernández*, 56 P.R.R. 459. See, also, *Multiple Causation and Damage*, 47 Harv. L.Rev. 1127; *Concurrent Causation*, 83 U. of Pa. L. Rev., 941; *cf. Simonpietri* v. *Blanco*, 74 P.R.R. 499. As we have repeatedly stated, ". . . When an injury is the result of the combined negligence of several persons, said persons are jointly and severally liable to the aggrieved party . . ."

---

[4] "Section 1807.—The owner of a building is liable for the damages which may result from the collapse of the whole or a part thereof, if it should occur through the absence of the necessary repairs."

[3] "Section 1444.—The lessor is obliged:

"1. To deliver to the lessee the thing which is the object of the contract.

"2. To make thereon, during the lease, all the necessary repairs in order to preserve it in condition to serve for the purpose to which it was destined.

"3. To maintain the lessee in the peaceful enjoyment of the lease during all the time of the contract.

"4. To sign and deliver to the lessee a receipt for each payment made by the latter."

*Cole* v. *Escambrón Development Co.,* 73 P.R.R. 477; *Rivera* v. *Great American Indemnity Co.,* 70 P.R.R. 787.

 In their seventh assignment the appellants, Francisco Quiñones, Escambrón Beach Club Hotel Corporation, and United States Casualty Co., contend that the lower court erred in rendering judgment against the Escambrón Beach Club Hotel Corporation jointly with Francisco Quiñones. They allege that: "inasmuch as this corporation did not exist at the time of the accident, it is not liable at all with respect to the plaintiff's claim and that the judgment against it was improperly rendered."

We disagree. The plaintiff alleged in paragraph 2 of her complaint that "the aforesaid corporation (Escambrón Beach Club Hotel Corp.) *took charge of all the property, rights and obligations* of said defendant Francisco Quiñones." (Italics ours.) In their answer to the complaint, these appellants expressly admitted that such allegation was true. Thus, since the corporation assumed without any limit "all the properties, rights and obligations" of its predecessor, it became liable for all the damages that his negligence might have caused while operating the business. See 15 A.L.R. 1112, especially at p. 1188.

 The last assignment, common to all the appellants, challenges the award of the sum of $4,000 for attorney's fees. The Escambrón Development Company, Inc., contends that the court abused its discretion in granting such an excessive sum. The other appellants hold that said sum is not justified because there was no obstinacy on their part in the prosecution of this suit.

In fixing the amount of attorney's fees the trial court must take into account the work necessarily done by the attorney for the party who obtained judgment, and in connection with it there should be considered the nature and the duration of the litigation, the character of the questions involved and the amount in controversy. See *Heirs of Trías* v. *P. R. Leaf Tobacco Co.,* 59 P.R.R. 228.

The two appellants denied liability for the damages suffered by the plaintiff. The granting of attorney's fees shows that in the opinion of the court the appellants were obstinate. *Font* v. *Pastrana,* 73 P.R.R. 238. Once their obstinacy was determined, the court was bound to impose attorney's fees. Considering the attendant circumstances, we do not believe that the sum of $4,000 is excessive.

The judgment appealed from will be affirmed.